JOURNAL ENTRY AND OPINION
{¶ 1} Defendant-appellant, J.G.[1] ("Father"), appeals from the decision of the Juvenile Court that awarded permanent custody of his son A.S. to the Cuyahoga County Department of Children and Family Services ("CCDCFS" or the "agency"). For the reasons that follow, we affirm.
 {¶ 2} A.S. was born prematurely and remained hospitalized for a period of time. On October 15, 2004, CCDCFS petitioned the Juvenile Court for temporary custody of A.S., which the court granted by order dated January 5, 2005. A.S. was placed in foster care on January 11, 2005. CCDCFS filed a case plan with a stated permanency goal of reunification. The plan applied to both Father and A.S.'s mother. Father was required to actively participate in a parenting program; to make provisions for a newborn child; to refrain from using alcohol or drugs; and to complete an alcohol and drug assessment.
 {¶ 3} On September 6, 2005, CCDCFS moved to modify the order of temporary custody to permanent custody. During proceedings before the Juvenile Court on September 13, 2005, testimony established CCDCFS's involvement with A.S. for almost a year. During that time, Father was offered visitation and it was alleged that for a period of four months, Father made no contact with A.S. The agency further offered parenting classes and drug and alcohol classes, which they maintain Father failed to satisfactorily complete. A.S. spent a brief period in the custody of a paternal cousin, who returned him to foster care. Based on this testimony, the Juvenile Court concluded that CCDCFS had made reasonable efforts to reunify and to meet the child's needs. The Juvenile Court at that time denied Father's requests for increased visitation due to Father's failure to attend many of the previously scheduled visits.
 {¶ 4} Toni Fecko, a counselor in the chemical dependancy program from Catholic Charities, testified at the evidentiary hearing. Fecko stated that Father came to two classes of a six-week program. She further identified Father's drug screen result as positive for cocaine. Fecko stated Father tested positive for cocaine on a subsequent date, which Fecko referred to as a "relapse." (CCDCFS Ex. 1 and 2 are Father's positive drug test results.) Father admitted to selling cocaine but denied using it. Father speculated that he tested positive for drugs because he stored bags of cocaine in his mouth to avert apprehension by the police for drug dealing.
 {¶ 5} Due to the relapse, Fecko recommended a higher level of care for Father than was initially proposed in the case plan. This included intensive outpatient treatment. The initial proposal for the less intensive group therapy was the result of Father's alleged dishonesty during his drug assessment. Father stopped participating in the treatment program following his relapse on March 22, 2005, despite numerous calls by Fecko to the social worker.
 {¶ 6} Foster Parent described A.S. as a calm baby. A.S. remained in his care except for a period of about five months when CCDCFS placed A.S. with a paternal relative. A.S. returned to foster care in August 2005, where he remained.
 {¶ 7} Foster Parent described A.S.'s reaction to visits with Father as disruptive to his sleep patterns, causing him to whimper in his sleep. It would take A.S. approximately two days to "settle down" back into his "more relaxed pattern."
 {¶ 8} A.S. reportedly gets along well with the other children in the foster home, in a sibling-type relationship. Foster Parent is unaware of Father sending A.S. any cards or gifts. Foster Parent expressed a desire to adopt A.S. in the event permanent custody was granted to CCDCFS.
 {¶ 9} Maureen Schroeck, an early intervention specialist for the Cuyahoga County Board of Mental Retardation and Developmental Disabilities, testified concerning her involvement with A.S. and his parents. Schroeck's duties include ongoing assessments, parent training, and child evaluation. Her initial contact with A.S. was in October 2004. She observed A.S.'s visitation with his biological parents in October 2005 for a period of one hour. A.S. was very upset and cried throughout most of the visit. A.S. would not take a bottle from either parent. A.S. tended to favor Father over the biological mother.
 {¶ 10} According to Schroeck's January 2006 assessment, A.S. was within range in all developmental areas except his communication skills. Schroeck described A.S's interaction with his foster family as "wonderful, typical, loving family. Responsive, engaging the child."
 {¶ 11} Amy Justice, a clinical psychologist contracted through Cuyahoga County Courts, conducted a psychological evaluation of A.S's biological mother ("Mother"). Justice opined that Mother qualified for a diagnosis of mild mental retardation. Justice offered no testimony relevant to Father.
 {¶ 12} CCDCFS also offered the testimony of its social worker, Kelly Lawlor. Lawlor was assigned to A.S. in September 2004. Lawlor developed the case plan. A.S. has been in agency custody since January 2005, roughly his entire life. A.S. entered agency custody upon his release from the hospital following his premature birth.
 {¶ 13} Lawlor placed A.S. with Foster Parents. In April 2005, A.S. was removed to the care of a paternal relative. The paternal relative, however, notified Lawlor in August 2005 that she could not manage A.S.'s care and requested his removal. A.S. was returned to his original Foster Parents.
 {¶ 14} Lawlor included both biological parents in the case plan. The plan required parenting classes for both parents, substance abuse treatment, and employment.
 {¶ 15} Father was referred to parenting class specific to fathers. He completed less than half of the program. Lawlor made a second referral for the parenting service but by the time of evidentiary hearing, Father had still not completed the program. Although she received some positive feedback, Father's attendance remained only sporadic.
 {¶ 16} It was recommended that Father complete an education component concerning substance abuse and he was referred to Catholic Charities. He did not complete the program and due to positive drug tests was requested to do a step-up. Despite encouragement from Lawlor to return for treatment, Father never returned. The referral expired, which required Father to submit to another assessment. From June 2005, Lawlor referred Father eight times for an assessment but he failed to show up for any of them. While Lawlor acknowledged Father relied on public transportation, she was adamant that Father never showed up for any of the referrals.
 {¶ 17} Lawlor offered Father employment programs and encouraged him to utilize community services and job boards. Father reported being self-employed but never provided any verification of employment.
 {¶ 18} Lawlor stated that Father was capable of satisfying basic needs as he had public housing.
 {¶ 19} Visitation was also a component of the case plan. The initial schedule provided for weekly visits on Fridays for two hours in a neutral location. Visits were periodically re arranged to accommodate transportation, the foster family, and the parents. Lawlor stated that out of 55 scheduled visits, the biological parents either missed or did not attend 32 of them. On four other occasions they arrived approximately one-half hour late.
 {¶ 20} Lawlor observed some of the visits between A.S. and the parents and described them as "horrible." A.S. would cry for "two full hours, hysterical, blood curdling screams." In her opinion, Father rejected her advice, saying he knew what his son needed. She also claimed Father would cuss at her, raise his voice, holler during the visits, and punch walls. This continued until April when the child was placed in the custody of a relative until August.
 {¶ 21} Although A.S. was in the custody of a relative, visits were to continue to be supervised through the agency. Lawlor reports no visits between April and August. The parents did not contact Lawlor concerning visitation again until A.S. was returned to agency custody.
 {¶ 22} In September 2005, Lawlor observed a visit with the parents, which she described as "one of the better visits." Although the parents promised cake and presents for A.S. on a following visit, they arrived with only a card and a half-eaten cake.
 {¶ 23} The more recent visits between A.S. and parents were going "okay." Father likes to hold A.S., yet, Lawlor reports that the parents have told A.S. that he "looks like the devil, that he's spoiled." On the positive side, Lawlor compliments Father's interaction and use of a child-like voice and that he likes to hold and snuggle the child. Father also makes a game out of feeding A.S. and plays with a pull toy with A.S.
 {¶ 24} Lawlor also testified that Father said he will not complete the services required by the case plan.
 {¶ 25} The agency considered relative placements for A.S., including the paternal relative who returned A.S. to the agency following a brief period of custody. Two other paternal relatives were contacted but were not interested in custody. The only appropriate maternal relative is the maternal grandmother who, according to Lawlor, was adamant that she did not want to raise her daughter's babies.[2]
 {¶ 26} Paternity was established for A.S. in November 2004. Although mother had previous children removed from her custody, they were not the offspring of Father. The agency initially sought only temporary custody of A.S. to allow Father the opportunity to provide for him.
 {¶ 27} A.S.'s maternal grandmother also testified. She has custody of another grandchild and claimed to be in a position to assume custody of A.S. as well. She has a two-bedroom residence but would be willing to relocate. Her own 17-year-old child would assist in caring for the children. She would also abide by any restrictions placed on her concerning interaction with Mother. Maternal grandmother admitted that Mother sometimes stays in her house and that she sometimes allows her to watch the children. Maternal grandmother stated that she and the biological parents would visit with A.S. during the time he was in the custody of the paternal relative.
 {¶ 28} Following the evidentiary hearing on the motion for permanent custody, the court issued findings of fact supporting its award of permanent custody. Father appeals assigning four assignments of error for our review. Assignments of Error II and IV were based on findings relative to Mother only and therefore, are overruled as moot. We address the remaining assignments of error together below.
 {¶ 29} "I. The Department of Children and Family Services failed to establish that Mr. George failed to substantially remedy the condition that caused the removal of the child.
 {¶ 30} "III. The Department of Children and Family Services failed to establish that Mr. George showed a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child."
 {¶ 31} In these assignments of error, Father contends that the trial court erred when it granted permanent custody of A.S. to CCDCFS in the absence of clear and convincing evidence. CCDCFS maintains the court did not abuse its discretion when it determined the best interest of the child would be served by granting CCDCFS permanent custody.
 {¶ 32} In considering an award of permanent custody, the court must first determine, by clear and convincing evidence, whether the child can be placed with a parent within a reasonable time or should not be placed with the parent. R.C. 2151.414(B)(1)(a). The court is required to enter a finding that the child cannot be placed with a parent within a reasonable time if any factors set forth in R.C. 2151.414(E) apply, including the following:
 {¶ 33} "(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.
 {¶ 34} "* * *
 {¶ 35} "(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child."
 {¶ 36} The trial court enumerated R.C. 2151.414(E)(1) and (4), which would be applicable to Father.
 {¶ 37} The court found, despite reasonable and diligent efforts by the agency, the parents failed to remedy the problems that initially caused A.S. to be placed outside the home. Further, the court found the parents continuously and repeatedly failed to substantially remedy the conditions that caused A.S.'s removal. The court cited the parents' failure to complete the case plan, including the provisions concerning chemical dependency. It was unrefuted that Father failed to complete the case plan designed for reunification. He did not complete the parenting classes, the substance abuse treatment program, and there was no evidence of verified employment. In fact, CCDCFS made eight referrals for assessment to assist Father in accomplishing the chemical dependency aspects of the case plan. Father failed to show up for any of them. And, contrary to Father's assertion, his repeated failure to comply with the drug treatment/therapy provisions of the plan was not the only aspect of the case plan that he did not complete. Thus, the court's finding under this provision is sufficiently supported by clear and convincing evidence.
 {¶ 38} The trial court also determined there was a demonstrated lack of commitment toward A.S. by failing to regularly support, visit, or communicate with him when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for A.S. Father takes exception with the court's reference that the "parents attended 13 full visits out of 55 possible visits." He, however, does concede that he missed 32 of the 55 scheduled visits. The record further suggests the court was referring not to visits "missed" but the number of "full visits" attended. For example, the record reflects that the parents were frequently late to the scheduled visits, yet the social worker would allow them to spend the remaining time with A.S., thus constituting a partial visit. In any case, attending a little over half of the scheduled visits with ones infant child does not establish a convincing commitment on Father's part to support, visit, or communicate with him. Accordingly, the finding of the trial court is supported by clear and convincing evidence.
 {¶ 39} Next, the trial court must determine whether it is in the best interest of the child to grant permanent custody. R.C. 2151.414(B) 
(D). The trial court found that A.S. could not be placed with either parent within a reasonable time or should not be placed with either parent within a reasonable time. The court further noted that A.S. was removed on October 4, 2004 and has been in the custody of CCDCFS continuously since that time.
 {¶ 40} In determining the best interest of the child during the permanent custody hearing, the court must consider the factors listed in R.C. 2151.414(D), which include the reasonable probability the child will be adopted, the interaction of the child with the child's parents, siblings, and foster parents, the wishes of the child, the custodial history of the child, and the child's need for a legal, secure, permanent placement.
 {¶ 41} Here, the court's findings included that it considered the R.C. 2151.414(D) factors. Although A.S. was incapable, due to his young age, of expressing his wishes, the court did consider the report of the Guardian Ad Litem.
 {¶ 42} The evidence in the record, set forth in detail above, includes that A.S. was doing well in his foster placement, bonding with the other children of the home in sibling-type relationships. A.S. has been in agency custody virtually his whole life following his premature birth. Except for a five-month period, A.S. has been in the constant care of the Foster Parents, who expressed a desire to adopt him. The court also considered relative placements but determined none to be suitable. The record supports the trial court's finding that placement with the maternal grandmother was not suitable, including the likelihood she would leave A.S. alone with the mother. Accordingly, there is clear and convincing evidence that supports the trial court's determination that permanent custody is in the best interest of the child.
 {¶ 43} We find that the trial court made its findings according to the statutory guidelines of R.C. 2151.414 and that these findings are supported by clear and convincing evidence. Therefore, these assignments of error are overruled.
Judgment affirmed.
It is ordered that appellee recover from appellant its costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Common Pleas Court, Juvenile Division to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
JAMES J. SWEENEY, PRESIDING JUDGE
ANTHONY O. CALABRESE, JR., J. and CHRISTINE T. McMONAGLE, J., CONCUR
[1] The parties are referred to herein by their initials or title in accordance with this Court's established policy regarding non-disclosure of identities of juveniles.
[2] Just prior to the hearing, maternal grandmother expressed a willingness to obtain custody with mother as a secondary caregiver with shared responsibilities. The agency was in the process of exploring this possibility. The concerns of this placement included missed doctor's appointments, size of the residence, and the hygiene, discipline, and interaction of the children.